UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

—————————————————————————

|  |  |
|---|---|
| JOVANA N. MOUKENGESCHAIE, on behalf of herself and all others similarly situated, | ) ) ) ) |
| Plaintiff, | ) **No. 14-cv-7539-MKB-CLP** ) |
| v. | ) **CLASS ACTION** ) **JURY DEMANDED** |
| ELTMAN, ELTMAN & COOPER, P.C., LVNV FUNDING LLC, and RESURGENT CAPITAL SERVICES L.P., | ) ) ) ) |
| Defendants. | ) ) |

—————————————————————————

## PLAINTIFF'S SECOND AMENDED COMPLAINT

### I. Introduction

1.     Plaintiff brings this class action on behalf of herself and consumers

subjected to Defendants' violations of the Fair Debt Collection Practices Act

(FDCPA), 15 U.S.C. § 1692, *et seq.* The FDCPA prohibits debt collectors from

engaging in abusive, deceptive, unfair, and illegal collection practices. In brief,

Plaintiff received a letter, a copy of which is attached as **Exhibit A** ("the Collection

Letter"), that threatened to seize real estate, cars, and other personal property,

even though Defendants were not legally permitted to seize those things and, in

fact, never intended to seize those things. The letter falsely implied that any real

estate, cars, and personal property owned by Plaintiff were not exempt from seizure

by Defendants. And the letter falsely represented that Plaintiff's alleged account

would be referred to what Defendants called their "Asset Investigation Department"

1

in an effort to locate Plaintiff's property – when, in fact, the kind of "Asset Investigation Department" described in the Collection Letter never existed, and Defendants had no intention of referring Plaintiff's alleged account to any such department.

2.      Moreover, Defendants – who claim to have purchased the account it was trying to collect after it had allegedly been reduced to judgment – never took the steps required by New York State law to take assignment of the judgment. Far from mere technicalities, these rules are designed to protect consumers from double payment of judgments by keeping them apprised of who the current judgment creditor actually is. By attempting to collect on the alleged judgment – including by threatening judicial remedies such as wage garnishment and attachment – before it had properly taken assignment of the judgment, Defendants falsely implied that they had a right to collect from Plaintiff when they had none.

3.      The Collection Letter was sent to Plaintiff by Defendant Eltman, Eltman & Cooper, P.C. ("EEC").

4.      In the Collection Letter, EEC purported to be collecting a debt on behalf of Defendant LVNV Funding, LLC ("LVNV"). As explained more fully below, LVNV is a debt collector covered by the FDCPA. Because "[c]ase law has held that an entity that itself meets the definition of debt collector may be held vicariously liable for unlawful collection activities carried out by another on its behalf," *Okyere v. Palisades Collection, LLC*, 961 F. Supp. 2d 508, 515-16 (S.D.N.Y. 2013) (internal quotation marks omitted), LVNV is vicariously liable for EEC's FDCPA violations.

5.     As explained more fully below, Defendant Resurgent Capital Services, L.P. ("Resurgent") was intimately involved in the collection of the alleged debt. In fact, Resurgent acts as the "master servicer" for all charged-off accounts purchased and held by LVNV. Moreover, because LVNV has literally zero employees, Resurgent is the "hands and feet" that perform all of LVNV's operations – including, but not limited to, retaining law firms such as EEC on behalf of LVNV. On information and belief, Resurgent also closely controls the activities of law firms like EEC, including by reviewing the collection letters EEC mails to consumers. It is both vicariously liable for the actions of its agent EEC under *Okyere* and primarily liable for its own participation in sending the Collection Letter.

6.     Defendant EEC mailed letters identical to the Collection to hundreds, if not thousands, of New York consumers who allegedly owed debts to LVNV ("the Class").

7.     Moreover, for many of the Class members, the debt Defendants were seeking to collect were judgments that had not been properly assigned under New York State Law ("the Sub-Class").

## II. Jurisdiction and Venue

8.     This Court has federal question jurisdiction under 15 U.S.C. § 1692k(d) and 28 U.S.C. § 1331.

9.     Venue is proper in this district under 28 U.S.C. § 1391(b), because the plaintiff resides in this district, and the acts and transactions that give rise to this action occurred, in substantial part, in this district.

### III. Parties

#### A.  Plaintiff Jovana N Moukengeschaie

10.     Plaintiff Jovana N. Moukengeschaie, is a natural person residing in the County of Queens in the State of New York and is a "consumer" as that term is defined by 15 U.S.C. § 1692a(3).

#### B.  Defendant Eltman, Eltman & Cooper P.C. ("EEC")

11.     Defendant EEC is a professional corporation organized and existing under the laws of the State of New York, with a principal place of business at 140 Broadway, 26th Floor, New York, New York 10005. EEC is regularly engaged in the collection of debts allegedly owed by consumers through correspondence and telephone calls, and thus is a "debt collector" as that term is defined by 15 U.S.C. § 1692a(6).

12.     At all times relevant to the events described in this Amended Complaint, EEC was acting as the agent of LVNV.

13.     At all times relevant to the events described in this Amended Complaint, EEC was acting as the agent of Resurgent.

#### C.  Defendant Resurgent Capital Services L.P. ("Resurgent")

14.     Defendant Resurgent is a limited partnership organized and existing under the laws of the State of Delaware, with a principal business address of 15 S. Main Street, Suite 600, Greenville, South Carolina 29601.

15.     Among other things, Resurgent acts as the "master servicer" of all defaulted consumer debts owned by LVNV.

4

16.    Resurgent services, manages, and collects upon each and every charged-off consumer debt purchased by LVNV, with no exceptions. LVNV's own website makes this clear:

> As the new owner of any debt previously owned by another creditor, LVNV's name may appear on a customer's credit report or in a letter from a collection agency.
>
> The management of purchased assets is outsourced to a third-party specializing in the management of these types of consmer assets, Resurgent Capital Services LP (Resurgent). Resurgent is a manager and servicer of domestic and international consumer debt portfolios for credit grantors and debt buyers, including LVNV, and performs these services on their behalf. Resurgent, a licensed debt collector, may perform these activities directly, or in most cases, will outsource the recovery activities to other, independent, specialized, licensed collection agencies. If you are a customer, please direct your inquiries to the firm currently servicing your account.

LVNV's website then provides a phone number for consumers to use to contact Resurgent – but provides no contact information whatsoever for itself. A copy of LVNV's website, downloaded on May 4, 2015, is attached to this Amended Complaint as **Exhibit B**.

17.    That Resurgent is involved in collecting all defaulted debts purchased by LVNV is further documented in these and other reported cases:

- *Fritz v. Resurgent Capital Services, LP*, 955 F. Supp. 2d 163, 168 (E.D.N.Y. 2013) ("LVNV purchases hundreds of thousands of dollars in consumer debt from creditors who have written off the accounts. It outsources efforts to collect those debts to defendant Resurgent . . . .");
- *Smith v. LVNV Funding, LLC*, 2 F. Supp. 3d 1089, 1098 (E.D. Tenn. 2014) ("LVNV has no employees, does not send collection

letters, and does not make telephone calls to debtors. LVNV does not report credit information to the three major credit reporting agencies. . . . All collection activities on the charged-off accounts are undertaken by Resurgent . . . . Resurgent services and manages the LVNV accounts either directly or through other licensed collection agencies or law firms.");

- *Bradford v. LVNV Funding, LLC*, 3 F. Supp. 3d 708, 717 (E.D. Tenn. 2014) ("All collection activities on the charged-off accounts are undertaken by . . . [Resurgent], a licensed collection agency. Resurgent services and manages the LVNV accounts either directly or through other licensed collection agencies or law firms.");

- *LVNV Funding, LLC v. Boyles*, 70 So. 3d 1221, 1224 (Ala. Civ. App. 2009) (quoting affidavit made by Resurgent employee stating that "Resurgent is the Master Servicing Agent and Attorney-in-Fact for [LVNV].");

- *Walls v. United Collection Bureau, Inc.*, No. 11 C 6026, 2012 WL 1755751 at *1 (N.D. Ill. May 16, 2012) (discussing collection letter sent by third-party that identified Resurgent as third-party's "Client" and LVNV as "Current Owner" of the account upon which third party was collecting);

- *Waters v. J.C. Christensen & Associates, Inc.*, Civil Action No. 08-11795-NG, 2011 WL 1344452 at *2 (D. Mass. Mar. 4, 2011) ("As of November 9, 2007, LVNV . . . owned the Account and Resurgent acted as the servicer of the Account.");

- *Veerhusen v. Capital Management Services, LP*, No. 8:09CV354, 2010 WL 8019878 at *1(D. Neb. Jan. 29, 2010) ("LVNV is under common ownership and management with Defendant Resurgent[,] . . . an entity that manages and services LVNV portfolios.");

- *Casso v. LVNV Funding, LLC*, Case No. 12-CV-7328, 2014 WL 7005032 at *1 (N.D. Ill. Dec. 10, 2014) ("All collection actions on debts purchased or otherwise acquired by LVNV are undertaken by Resurgent on LVNV's behalf.");

- *Rawson v. Source Receivables Mgmt., LLC*, (discussing, in case involving defaulted debt owned by LVNV, a collection letter sent by third-party agency that stated that Resurgent had placed defaulted debt with third party);

- *Covert v. LVNV Funding, LLC*, 779 F.3d 242, 244-45 (4th Cir. 2015) ("[]LVNV then filed a proof of unsecured claim based on these debts in each [class member's] bankrupty proceeding through its servicer, Resurgent . . . .").

18.     Moreover, LVNV has granted Resurgent a Power of Attorney, designating Resurgent as its attorney-in-fact, and noting that LVNV "has

retained the services of Resurgent . .  to service, liquidate and manage

accounts receivable on behalf of [LVNV] . . . ." A copy of this Power of

Attorney, which is publicly available on the Greenville County, South

Carolina Recorder of Deeds website, is attached to this Amended Complaint

as **Exhibit C**.

19.    Since Resurgent services and collects upon every defaulted debt

owned by LVNV, it follows – and Plaintiff therefore alleges – that Resurgent

was servicing and collecting upon the alleged debts LVNV was attempting to

collect from Plaintiff and the members of the Class.

20.    Further, since Resurgent is always involved in retaining law

firms and other collection agencies on behalf of LVNV, it follows – and

Plaintiff therefore alleges – that Resurgent retained EEC on behalf of LVNV

to collect alleged debts from Plaintiff and members of the class.

21.    At all times relevant to the events described in this Amended

Complaint, Resurgent was acting as LVNV's agent.

22.    At al times relevant to the events described in this Amended

Complaint, EEC was acting as LVNV's agent.

23.    Resurgent is vicariously liable for any FDCPA violations

committed by EEC.

24.    Resurgent uses instrumentalities of interstate commerce and

the mails to collect the debts owed or due to LVNV. In addition, it indirectly

collects debt owed or due to LVNV by retaining law firms like EEC and other

third-party debt collectors to collect LVNV's accounts. Resurgent is therefore a debt collector as that term is defined by 15 U.S.C. § 1692a(6).

### D.  Defendant LVNV Funding LLC ("LVNV")

25.     Defendant LVNV is a limited liability company organized and existing under the laws of the State of Delaware. Its principal place of business is at 625 Pilot Road, Suite 3, Las Vegas, Nevada 89119.

26.     LVNV is a debt collector as that term is defined in 15 U.S.C. § 1692a(6) for at least four reasons.

> i.  *LVNV is a debt collector because its business consists of purchasing already charged-off debt consumer debts and collecting on them.*

27.     LVNV's business consists solely of purchasing, owning, and facilitating collection of consumer debts. Each consumer debt LVNV purchases, owns, and collects upon is in default at the time LVNV purchases the debt.

28.     There is no evidence, on LVNV's own website or otherwise, that LVNV ever extends credit or otherwise originates loans.

29.     Thus, LVNV is a debt collector as that term is defined by 15 U.S.C. § 1692a(6), and not a creditor as that term is defined by 15 U.S.C. § 1692a(4).

> ii. *LVNV is a debt collector because it has filed thousands of state court lawsuits to collect on consumer debts that were already charged-off when LVNV bought them.*

30.     One of the ways that LVNV facilitates the collection of the defaulted consumer debts it purchases is by suing. For instance, a search of the New York

8

State Unified Court System eCourts database reveals that LVNV was the plaintiff in nearly 400 debt-collection lawsuits in 2014 in the New York City Civil Court, Kings County. LVNV also filed nearly 500 debt-collection lawsuits in 2014 in the New York City Civil Court, Queens County. Statewide, LVNV sued consumers more than 3,500 times in 2014.

31.     Often, the captions of these state court cases make clear that LVNV purchased the subject charged-off debts from original creditors. For instance, an eCourts searched turned up captions that listed LVNV "A/P/O ["as purchaser of"] World Financial Netowrk," "A/P/O Credit One Bank, N.A.," "A/P/O Citibank (South Dakota), NA," "a/p/o HSBC Bank Nevada, N.A.," "a/p/o Capital One Bank (USA) NA," "A/P/O GE Money Bank," "A/P/O Washington Mutual Bank," and "A/P/O Wells Fargo Financial."

32.     In other cases, the complaints prepared by the debt-collection law firms show that LVNV purchased the debts sought to be collected were purchased from original creditors after the defendant consumers had allegedly defaulted.

33.     Thus, LVNV is a "debt collector" as that term is defined by 15 U.S.C. § 1692a(6) and not a "creditor" as that term is defined by 15 U.S.C. § 1692a(4).

>           *iii. LVNV is a debt collector because all or most of its income is*
>           *derived from the collection of debts.*

34.     LVNV's *sole* business is to purchase consumer debts after those defaults have gone into default, then to collect on those defaulted debts directly (for instance, by suing on them) or indirectly (for instance, by hiring its affiliate Resurgent to place telephone calls or write letters to consumers).

35.     It follows – and Plaintiff therefore alleges – that all or most of LVNV's income is derived from the collection of consumer debts that are already in default when LVNV purchases them.

36.     The percentage of a company's income that is derived from debt collection is one indicator of whether the company is a "debt collector" as that term is defined by 15 U.S.C. § 1692a(6). *See Scott v. Jones*, 964 F.2d 314, 316 (4th Cir. 1992).

37.     Therefore, LVNV is a debt collector subject to the FDCPA.

> *iv. LVNV is a debt collector because it plays a key role in a complex web of companies that, together, constitute a single debt collection enterprise.*

38.     LVNV, along with Resurgent and non-parties Sherman Financial Group ("SFG"), Sherman Originator LLC ("SO"), Alegis Group LLC ("Alegis"), Sherman Capital Markets LLC ("SCM"), Sherman Acquisition Limited Partnership ("SALP"), Sherman Acquisition LLC ("SA"), Sherman Acquisition II Limited Partnership. ("SAIILP"), Sherman Acquisition II General Partner LLC ("SAIIGP"), Sherman Capital, L.L.C. ("SC"), Sherman Originator III LLC ("SOIII"), and Sherman Capital Group Inc. ("SCG"), and other Unknown Sherman Entities, together comprise a single, integrated debt-collection enterprise ("the Sherman Companies").

39.     The Sherman Companies' operations are so tightly interwoven and so closely controlled by their common owners that, in effect, they operate as mere departments of a single company. The Sherman Companies, operating in lock-step

under the control of a few individuals, constitute the largest purchaser and collector of defaulted consumer credit-card debts in the world. Because, among other reasons, their operations are so interrelated and under such close central control, together they constitute a debt collector that is covered by the FDCPA.

40.    In the course of conducting the Sherman Companies' business, corporate formalities are rarely, if ever, observed.

41.    LVNV's purpose within the Sherman Companies is to serve as a "ownership vehicle" for defaulted consumer debts – including debts allegedly owed by New York State consumers such as Plaintiff and members of the Class. Other of the Sherman Companies purchase the defaulted consumer debts, then transfer the defaulted consumer debts to LVNV, which holds title to the defaulted consumer debts while other of the Sherman Companies collect on the debts. Strategic decisions as to which portfolios of defaulted consumer debts are purchased, and how those defaulted debts are to be collected, are made by still other of the Sherman Companies. In sum, LVNV is a mere department of the Sherman Companies' single debt-collection enterprise.

42.    The structure of the Sherman Companies is intentionally labyrinthine. An organizational chart that partially demonstrates this labyrinthine structure, and which was first filed as an exhibit in the unrelated case of *Cox v. Sherman Capital LLC*, Southern District of Indiana, Case No. 1:12-cv-01654(TWP)(MJD), is attached to this Amended Complaint as **<u>Exhibit D</u>**.

43.     Another source of information on the complex organizational structure of the Sherman Companies is an Order issued by the Maryland State Collection Agency Licensing Board on October 25, 2011 ("the Maryland Order"). The Maryland Order, a copy of which is attached to this Amended Complaint as **Exhibit E**, is Plaintiff's basis for many of the allegations below.

44.     As one can see from **Exhibit D**, LVNV is a wholly owned subsidiary of non-party SO, which itself is a wholly owned subsidiary of SFG.

45.     The purpose of SO – other than to own LVNV – is to purchase portfolios of defaulted consumer debt.

46.     SO has no employees. Plaintiff's basis for this allegation is deposition testimony given by Benjamin Navarro in the *Cox* that was recently unsealed ("the Navarro Deposition"), which is attached as **Exhibit F** to this Amended Complaint. The relevant portion of the Navarro Deposition is page 29 (original pagination).

47.     Strategic decisions as to which portfolios of defaulted consumer debts are purchased are made by amorphous "working groups" or "teams" composed solely of directors of SCM, which are described in more detail below.

48.     The purpose of SFG is to own and operate the vast debt-collection enterprise described in this Complaint, particularly in section III.D.iv.

49.     The finances of many of the other Sherman Companies – including, but not limited to, SO, SALP, SA, SAIILP, SAIIGP, SOIII, Alegis, Resurgent and LVNV – are consolidated into the finances of SFG, such that the audited financial statements prepared for SFG include the financial results of these Sherman

Companies. A heavily redacted version of SFG's audited financial statements that demonstrates this is attached to this Amended Complaint as **Exhibit G**.

50.     The finances of the Sherman Companies noted in paragraph 49 are consolidated into the finances of SFG because the individuals who ultimately control SFG believe that SFG has the sole power to direct the activities of those Sherman Companies, and because the individuals believe that SFG has the obligation to absorb those Sherman Companies' losses as well as the right to benefit from those Sherman Companies' profits.

51.     SFG has no paid employees. Rather, it and its subsidiaries are managed and operated by the employees of SCM under a "management services agreement." This agreement calls for SCM to provide essentially all management services for SFG.

52.     Moving up another level of the Sherman Companies' organizational structure, SFG is a wholly owned subsidiary of SC. Put another way, SC is the sole member of SFG, and all profits and losses of SFG are allocated to SC.

53.     In the past, SC has listed its address as "c/o Sherman Capital Markets LLC."

54.     On information and belief, SC has no employees. SC's sole purpose is to own SFG, as part of a labyrinthine structure designed to obscure the identities of the Sherman Companies' owners and operators and to avoid liability under the FDCPA. Plaintiff's basis for this allegation is the Navarro Deposition (**Exhibit F**), pages 30-31 (original pagination).

13

55.     SCM has a total of approximately 30 employees, who manage, supervise, and operate the vast debt-collection enterprise described in section III.D.iv, as well as SFG's other business operations.

56.     SCM is a wholly-owned subsidiary of SCG.

57.     On information and belief, SCG has no employees.

58.     SCG's sole purpose is to own SCM, as part of a labyrinthine structure designed to obscure the identities of the Sherman Companies' owners and operators and to avoid liability under the FDCPA. Plaintiff's basis for this allegation is the Navarro Deposition (**Exhibit F**), page 34.

59.     SFG wholly owns several other subsidiaries in addition to SO. SFG's wholly-owned subsidiaries include SA, SOIII, and Alegis. SFG's other subsidiaries, which may or may not be wholly-owned, include SALP, SAIILP, and SAIIGP. All serve essentially the same function as SO as described above: to purchase portfolios of defaulted consumer debt.

60.     SA, SOIII, SAIIGP, SALP and SAIILP have no employees. Plaintiff's basis for this allegation is the Navarro Deposition (**Exhibit F**), pages 29-31 (original pagination).

Strategic decisions as to which portfolios of defaulted consumer debts are purchased are made by amorphous "working groups" or "teams" composed solely of directors of SCM, which are described in more detail below.

61.     Alegis is a wholly-owned subsidiary of SFG. Alegis is a limited liability companies organized and existing under the laws of the State of Delaware, with a

principal business address of 15 S. Main Street, Suite 600, Greenville South Carolina 29601.

62.     Alegis has no employees. Its sole business purpose is to hold a one-percent general-partnership ownership interest in Defendant Resurgent.

63.     SFG holds a 99-percent limited-partnership interest in Resurgent.

64.     In other words, the limited partnership (Resurgent) and its general partner (Alegis) are both subsidiaries of the limited partner (SFG). The purpose of this arrangement is to shield SFG from FDCPA liability, particularly in class actions.

65.     Alegis exercises unfettered control over Resurgent. This is demonstrated, for example, in the reported case of *LVNV Funding, LLC v. Boyles*, 70 So. 3d 1221, 1225 (Ala. Civ. App. 2009). In that case, LVNV produced as evidence a document called "Alegis Group LLC – Written Consent of Action of the Board of Managers in Lieu of a Meeting." According to that document, it is Alegis – not any director of Resurgent – that decides which Resurgent employees will sign papers on behalf of LVNV.

66.     As more fully explained below, the Alegis managers who actually run Resurgent all hold key positions at the other Sherman Companies listed in paragraph 38.

67.     Thus, it is impossible to distinguish Resurgent as a discrete business apart from the rest of the Sherman Companies. Moreover, the following additional

15

show that Resurgent is a mere department of the single economic enterprise that is

the Sherman Companies:

- The majority of Resurgent's revenue is paid by SFG or SFG's subsidiaries.

- There are significant cash transactions in both directions between Resurgent and SFG, and between Resurgent and SFG's other subsidiaries. These intercompany balances do not bear interest and most are settled within 30 days.

- Resurgent regularly receives cash from SFG to fund operations conducted on behalf of SFG's other subsidiaries.

- Resurgent regularly provides various management services – in addition to debt collection services – to other of SFG's subsidiaries.

A redacted audited financial statement for Resurgent that demonstrates these facts

is attached to this Amended Complaint as **Exhibit H**.

68.     Finally, a press release issued by SFG in May 2014 characterizes

Resurgent as a mere division of SFG. The press release also states that a single

management team represented SFG and Resurgent in a settlement negotiation with

the New York State Attorney General's [NYSAG] office. A copy of SFG's press relase

is attached to this Amended Complaint as **Exhibit I**.

69.     Perhaps most telling of all, the NYSAG's press release indicated that,

as part of a settlement, SFG would "seek to vacate . . . [400] improper [time-barred]

judgments with the courts and will immediately cease any further collection efforts

on the judgments." A copy of the NYSAG's press release is attached to this

Amended Complaint as **Exhibit J**.

16

70.     Yet, a search of the New York State Unified Court System reveals that SFG has been the named plaintiff in only three debt-collection lawsuits since the beginning of time.

71.     On information and belief, the named plaintiff in the lawsuits that were the subject of SFG's settlement with the NYSAG was LVNV. It would follow – and Plaintiff therefore alleges – that LVNV had retained Resurgent to collect on the judgments.

72.     The facts that SFG could agree with the NYSAG to vacate judgments entered in favor of LVNV, and that SFG could agree that Resurgent would cease collecting on those judgments, demonstrate that SFG has the authority to direct the activities of LVNV and Resurgent and does in fact direct them.

73.     Non-parties Huger Street LLC, Moultrie Street LLC, Woolfe Street LLC, Fulton Street LLC, Avondale Street LLC, Jasper Street LLC, Concord Street LLC, Hagood Street LLC, Charlotte Street LLC, Archdale Street LLC, Jacobs Alley LLC, Peachtree Street LLC, Greenhill Street LLC, Chalmers Street LLC, and Princess Street LLC (collectively referred to as the "Street Name Entities") all possess fractional ownership interests in SC, which sits atop SFG at the top of the Sherman Companies' organizational structure.

74.     The facts alleged in paragraph 73 as well as other facts alleged below are demonstrated by a letter containing discovery responses that was written by counsel for LVNV and Resurgent in the case of *Cox v. Sherman Capital LLC*, Southern District of Indiana, Case No. 1:12-cv-01654(TWP)(MJD). That letter,

which was attached as an exhibit in the *Cox* case and recently unsealed, is attached to this Amended Complaint as **Exhibit K**.

75.    The Street Name Entities were formed in late 2012 by certain of the Sherman Companies and/or certain individuals who own and control the Sherman Companies. The Street Name Entities were formed around the time that non-party Meeting Street Partners II, Inc. – the previous ownership vehicle for SC and SCM – was dissolved.

76.    On information and belief, the Street Name Entities have no employees, and their sole purpose is to own SC and, on information and belief, to own SCG. The Street Name Entities exist to obscure the identities of the individuals who own them and who ultimately control the Sherman Companies. They also exist to facilitate transfer of assets and liabilities between the Sherman Companies and themselves, to artificially deflate the Sherman Companies' net worth to avoid liability in FDCPA class actions.

77.    Non-party Meeting Street Partners II, Inc. – the previous ownership vehicle for SC and SCM – was ultimately owned by five individuals: Benjamin W. Navarro, Leslie Gutierrez, Scott E. Silver, Kevin P. Branigan, and Robert A. Roderick.

78.    On information and belief, Navarro, Silver, Branigan and Roderick, along with Kennett R. "Rusty" Kendall, now possess all of the ownership interest in the Street Name Entities and/or SCG.

79.   Except for SCM and Resurgent, none of the Sherman Companies have any employees.

80.   Resurgent has between 500 and 1000 employees and is actively engaged in using instrumentalities of interstate commerce and the mails to collect on defaulted consumer debts purchased and owned by the Sherman Companies. Resurgent also hires other third-party debt collectors to collect on the defaulted consumer debts owned by the Sherman Companies.

81.   SCM has approximately 30 employees, all of whom hold the title of "Director." These employees, together with select senior employees of Resurgent, direct and manage the Sherman Companies' entire unified debt-collection enterprise. They do so in the form of amorphous, ad-hoc "working groups" formed to work on specific issues related to raising capital, purchase of portfolios of defaulted debt, collection strategies and tactics, and overall business development.

82.   Except for Resurgent's staff of on-the-ground debt collectors and Resurgent's other support staff (information technology, human resources, etc.) SCM's approximately 30 employees are the *only* people who direct, manage, or operate the Sherman Company's vast debt-collection enterprise. The working groups described in paragraph 81, which run the Sherman Companies' entire debt collection business, utterly ignore each of the individual Sherman Companies' corporate formalities.

83.   Plaintiff's allegations concerning the working groups are based, in part, on the deposition testimony of Kendall given in the *Cox* case ("the Kendall

Deposition"). A copy of the recently unsealed deposition transcript is attached to this Amended Complaint as **Exhibit L**.

84. The following excerpts from the Kendall Deposition are especially relevant (all page numbers refer to original pagination):

Pages 58-59

Q: What is the role of a director at Sherman Capital Markets, LLC?
A: Just a title.

Pages 83-84

Q: . . . [D]o you have the oversight over the issuing of debt notes?
…
A: There is a team – there is a team of people that do various things.
Q: And you're a member of that team?
A: It depends on the project we're working on.
Q: And is the team a set number of individuals?
A: No.
Q: . . . [T]he number of individuals on the team varies depending on the topic?
A: Yes.
Q: Is the team – are they other directors that we mentioned previously? . . . Are those the other team members, other directors?
A: It's not title specific.
Q: So it can be just people that work for Sherman Capital Markets?
A: Title agnostic.

Pages 86-88

Q: . . . Are you responsible for overseeing the financial activities of LVNV Funding, LLC?
A: It's a team based approach.
Q: Could you describe the team based approach. Just generally. I'm a little confused over it, but could you give

me kind of an explanation of what you mean by the "team based approach."

A: Various individuals do various things.

Q: Do all the members of the team agree before you move forward in doing things?

A: For the most part.

Q: Do you hold meetings on a regular basis with the team over LVNV Funding, LLC?

A: Define "meeting."

…

Q: I think you wanted me to define "meeting." Are there formal meetings where you, I suppose, call everybody together and you have a date set for individuals to come and meet? And I guess there are informal meetings where you guys discuss business and business dealings. Does your group hold formal meetings to discuss the direction of LVNV Funding, LLC?

A: We have mainly informal meetings.

Q: So informal meetings that might be something that: Hey, we have a problem. We've got to deal with it right now.

A: A variety of different things.

Q: So there is a working group of individuals within the Sherman entities that helps to make some decisions concerning LVNV Funding even though it doesn't have employees?

…

A: It's a wide, varied group.

Q: LVNV Funding does not have employees; correct?

A: Correct.

Q: So this group of individuals kind of formally and informally will make some decisions that are needed concerning LVNV Funding, LLC?

A: Correct.

Q: Is it the same style with Sherman Capital Markets, LLC, to engage in that regard as well?

A: Yes.

Pages 92-93

Q: So the financing which is arranged by Sherman Capital Markets, LLC to buy the credit card account receivables, is that performed by the working group that you described earlier?

21

. . .
Q: The financing is arranged by the same group I talked about earlier.

Page 97

Q: As CFO for Sherman Capital Markets do you report to anyone above you? Do you have a superior?
A: Yes.
Q: And who is that?
A: Ben Navarro.
Q: What position does your superior hold in Sherman Capital Markets, LLC?
A: I'm not sure of his exact title. Chairman.
Q: Is he one of the members of the working group that you described earlier?
A: He can be.
Q: Do you report to – do you keep him updated, Mr. Navarro, of what you do on the job?
A: Informally.
Q: You don't provide him any reports, do you?
A: No.

Pages 99-101

[*Kendall had previously testified that he was the CFO of SCM (pg. 8) and that he didn't know whether he was the treasurer of LVNV (pg. 14). Moreover, Kendall's attorney represented on the record that Kendall was not CFO of LVNV (pg. 26).*]

Q: As CFO [of SCM] you stated – earlier you stated you worked with banks to arrange financing. Does that include contacts by phone calls, emails? That type of stuff.
A: Yes.
. . .
Q: Does the work that you do include – the work that you do does include the financing – let's put it this way: Arranging the financing with regards to the purchase of credit card account receivables.
A: My work that I do [as CFO of SCM] involves LVNV Funding and the financing documents on LVNV Funding.
Q: Are you the treasurer at LVNV Funding?

A: Is that my title, my corporate title, in LVNV Funding? I believe so. I don't have that in front of me. I have a corporate title.

Q: Is it just a name? Does it have a laid-out role?

A: It's a corporate title.

Q: Just a corporate title. You do have standard functions for the job as treasurer?

A: Define what that means.

Q: I'm sorry. I'll try to say it in a way that is a little bit more clear. Does the role of treasurer have a set of duties to perform in that position?

A: I don't know.

Page 103

Q: And you may hold that position as CFO, but in that position of CFO it is a position where there is a working group that oversees what you do; is that correct?

. . .

A: Yes. There is a working group that I work with. A working group doesn't oversee me.

Q: So the only oversight that you had mentioned earlier was just Mr. Navarro?

A: It's a collegial group that works together that oversees each other.

Page 110

Q: Does LVNV have a CEO?

A: That question is so nonsensical, the answer is no.

Page 113

Q: . . . Is there anybody at Sherman Capital Markets, LLC that is responsible for the oversight of what goes on with these assets that LVNV Funding holds?

A: There is no one specific individual.

Q: Is this the group that is responsible that [sic], or is there something else?

A: There is a large – there is a large group of individuals that service the receivables in LVNV Funding.

Q: When you use the term "service the receivables," are you talking about collecting those receivables?

A: I'm talking about all different functions.

. . .
Q: The assets of LVNV Funding, LLC, is there an
individual that oversees those assets?
A: There is a large group of people that are involved in the
servicing of those assets.
Q: That's not what I asked. Who is responsible for the
management of the LVNV Funding assets?
. . .
A: There is a large group. I can't answer it in any other
way.
. . .
Q: Is there an entity or an accounting group that audits
LVNV Funding, LLC's assets?
A: Are you talking externally or internally?
Q: We'll start with internally.
A: There are functional groups of people that do a variety
of tasks with regard to the receivables that aren't [sic] in
LVNV Funding, whether it's collections, whether it's
servicing, whether it's tax, whether it's finance. There is a
wide and varied group of people.
Q: And of that wide and varied group of people is there a
designated group responsible for audit of on [sic] LVNV's
assets?
A: You have to define what "auditing" means.

85.    Plaintiff's allegations concerning the working groups are further based

on the deposition testimony of Gutierrez – a former Director and CFO of SCM –

given in the *Cox* case ("the Gutierrez Deposition"). A copy of the recently unsealed

deposition transcript is attached to this Amended Complaint as **Exhibit M**.

86.    The following excerpts from the Gutierrez Deposition are especially

relevant (all page numbers refer to original pagination):

Pages 27 –28

Q: Do you think there was at least ten individuals that
ran the operations of Sherman Capital Markets, LLC?
A: It's difficult to answer that with a specific number
because –
Q: It changed?

A: It was a collaborative work environment. So there wasn't a definitive number.

Q: I understand. When you talk about the collaborative work environment – I've heard the term like "group" before, a working group or something to that degree. Was it this group of collaboration that managed Sherman Capital Markets, LLC?

. . .

A: There is not – or was not a specific working group. It would depend on a particular issue or project.

Page 31

Q: Was [Kendall] in the working group at the time that you worked there?

. . .

A: Again, you keep referring to a working group. There is not a specific working group. I mean, there would be groups that worked on things together and there would be groups where we didn't work together, so . . .

Pages 35-36

Q: Did your job as CFO for Sherman Capital Markets, LLC involve any form of strategies with regard to LVNV Funding?

. . .

A: Financing strategies? I was involved in certain capacities with financing for LVNV.

. . .

Q: Was that a function of what Sherman Capital Markets, LLC does?

A: Work on financing for LVNV?

Q: To raise capital. Raise capital for LVNV?

A: Right. For them to purchase –

Q: It was among other responsibilities.

Pages 39-41

Q: Did you have any work that you performed with Sherman Originator III?

A: Again, I think, as I've answered previously, responsibility for financial reporting for Sherman

Financial Group owned entities, one of which being
Sherman Originator III.
. . .
Q: So in the position of Sherman Capital Markets, LLC's
CFO you still have a relationship with a company like
Sherman Originator III, LLC in working the financial
side to make sure that they're able to have the money to
make these purchases of consumer credit card accounts?
. . .
A: Sherman Capital Markets is involved in financing and
raising financing for LVNV Funding, which was used to
purchase credit card receivables. That's the basic
business.
. . .
Q: So LVNV Funding – I'm going to use the term
"Sherman" because I don't know which person might be
doing it. But there is no issuance of securities to
consumers or financial entities for purchase by any of the
LVNV companies?
. . .
A: I mean, very simply LVNV – we arranged bank loans
for LVNV Funding for the purchase of credit card
receivables. "We" being Sherman Capital Markets.

Pages 48-49

Q: . . . [T]he purchases of those consumer credit card
accounts is done with financing from different sources
which you've worked to bring in through Sherman Capital
Markets, LLC; is that correct?
A: The funds for the purchase of the credit card
receivables owned by LVNV are from bank loans – the
funds for the purchase of assets – the asset of credit card
receivables with LVNV Funding are from bank loans
arranged by Sherman Capital Markets for LVNV
Funding.

87.    Finally, Plaintiff's allegations concerning the working groups are

further based on the deposition testimony of Roderick given in the *Cox* case ("the

Roderick Deposition"). A copy of the recently unsealed deposition transcript is

attached to this Amended Complaint as **Exhibit N**.

88.     The following excerpt from the Roderick Deposition are especially

relevant (all page numbers refer to original pagination):

Pages 67-69

Q: Are you involved in running the day-to-day operations
of Sherman Capital Markets, LLC in your position as
director?
A: No.
Q: Who is responsible – who is the top guy or gal
responsible for running the day-to-day operations of
Sherman Capital Markets, LLC?
A: There is no formal organization structure in the
company.
Q: You have no division of labor within Sherman Capital
markets, LLC?
. . .
A: There are groups of people that have functions, but we
interact kind of, I guess, collegially in our processes.
Q: Are these groups called – are they called "groups," or
do they have another name, like "committee" or
something like that?
A: They don't have a name, really. They're just groups of
individuals that are coordinated on a particular task or
function.
Q: Is there an assignment of duties at all between these
grouped individuals?
A: I'm not sure I understand your question.
Q: Well, I'm just – does everyone know what they're
supposed to do when they come in to work?
A: Yes.
Q: And that is laid out in what way within Sherman
Capital Markets?
A: I guess I would have to call it collegial collaboration.
Q: How often do the groups meet?
. . .
A: You know, in all sincerity, without being cute, as
frequently as needed. There is no time frame set. The
meetings just happen when they're needed.
Q: How many individuals are within the group?
. . .

> A: There are – it depends on the group of people and the
> task at hand. There is – it's not what you're thinking
> about in terms of a department or unit in a corporation.
> Q: Are each one of the group members employees of
> Sherman Capital Markets, LLC?
> A: Yes.

89.     The working groups composed solely of SCM directors feel free to move

money and other assets between and among the various Sherman Companies at

will, apparently because they view the assets of all the Sherman Companies as

comprising a common till. This is demonstrated by a final excerpt from the Kendall

Deposition (**Exhibit L**), pages 89-93 (original pagination):

> Q: I'm wondering where does that money come from to
> purchase those credit card accounts?
> A: A variety of different places.
> Q: Does it come from internal sources within the
> company?
> A: Cash is fungible.
> Q: Is that a yes?
> A: It's not an answer. It's cash is fungible.
> . . .
> Q: . . . That fungible cash that Sherman Capital Markets,
> LLC possesses, is that used to purchase credit card
> account receivables?
> A: Cash is fungible.
> Q: Is that a yes?
> A: It's not a yes or a no.

90.     Silver and Branigan also gave deposition testimony in the *Cox* case;

the recently unsealed transcripts of the Silver Deposition and Branigan are

attached to this Amended Complaint as **Exhibit O** and **Exhibit P**, respectively,

because they form Plaintiff's basis for several of the allegations that follow.

91.     The five individuals who own the Street Name Entities and/or SCG –
Navarro, Silver, Branigan, Roderick, and Kendall – occupy a number of senior
positions within the various Sherman Companies.

92.      This allegation, like many of the allegations that follow, is
demonstrated in the Maryland Order (**Exhibit E**) as well as in the unsealed *Cox*
depositions (**Exhibits F & L-P**).

93.     Navarro, in addition to ultimately owning a substantial share of the
Street Name Entities and/or SCG, is or has been: the acting President and CEO of
SFG; a Manager at Alegis; a General Manager at LVNV; an employee of SCM, as
well as the President and CEO of SCM; and President and CEO, as well as a past
member, of SC. In addition, all of the Sherman companies are named after
Navarro's childhood dog.

94.     Silver, in addition to ultimately owning a substantial share of the
Street Name Entities and/or SCG, is or has been: Secretary of LVNV; acting
General Counsel of SFG; an employee of SCM; a director and the Secretary of SCM;
the Secretary and General Counsel, as well as a vice president, of SC; the general
counsel for all of the Sherman Companies except Resurgent; and a supervisor of
legal affairs at Resurgent.

95.     Branigan, in addition to ultimately owning a substantial share of the
Street Name Entities and/or SCG, is or has been: the President of LVNV; an
employee, a director, and the Vice President of SCM; a vice president of SFG; the
president and CEO of SOIII; the President and CEO of SO; the President and CEO

of SA; and a Vice President of SC. He has signed legally binding contracts on behalf of SO.

96.     Roderick, in addition to ultimately owning a substantial share of the Street Name Entities and/or SCG, is or has been: an individual owner of SC; the CEO and a manager of Alegis; an employee of SCM; and a director SCM.

97.     In addition to the positions listed above, Navarro, Silver, Branigan, and Roderick have also served as directors, managers, and offices of various other subsidiaries of SFG in varying capacities.

98.     Kendall, in addition to ultimately owning a substantial share of the Street Name Entities and/or SCG, is or has been: a director of SCM; the Chief Financial Officer of SCM; the CFO and Treasurer and a Vice President of SO; the CFO and Treasurer and a Vice President of SA; the CFO and Treasurer and a Vice President of SOIII; the acting CFO of SFG; and the CFO of LVNV. Kendall manages the financial reporting for all of the Sherman Companies.

99.     Navarro, Silver, Branigan, Roderick, and Kendall all regularly supervise and participate in the "working groups" that direct the Sherman Companies' single debt-collection enterprise described in this Amended Complaint.

100.     During deposition testimony given in the *Cox* case, Navarro, Silver, Branigan, Roderick, Kendall, and Gutierrez frequently had trouble remembering the titles they held at the various Sherman Companies. They also frequently had trouble remembering the relationships among the various Sherman Companies, and whether they had ownership interests in the various Sherman Companies. This

demonstrates that, in actual practice, the boundaries between the various Sherman Companies are meaningless, and that Navarro, Silver, Branigan, Roderick, and Kendall run the Sherman Companies as a single business enterprise.

101.    These individuals' attitude toward the Sherman Companies is best summed up by the following excerpt from the Silver Deposition (**Exhibit O**), page 9 (original pagination):

> THE WITNESS: Yeah. I mean, I've been employed by the group, so to speak, since 1999. There have been some corporate restructuring, so – but overall, to cut to the chase, I've been with the company, you know, the overall group since 1999, roughly. Early 1999, I think.

102.    In addition to the 15 Street Name Entities, 12 individuals and one trust own fractional interests in SC. Those 12 individuals are: Roderick; Robert Banasik; Scott Kester; Daniel Picciano III; Amanda Smith; James Wagner; Philip T. Thurmond III; Michael Keaton; Gregory Hammond; Jon Mazzoli; Terry O'Connell; and Dennis Grady. The trust that owns a fractional interest in SC is the "R Roderick Trust."

103.    Kester, in addition to possessing a fractional interest in SC, is the Director of Finance for SFG and Treasurer and an Executive Vice President of Resurgent. He is also the Secretary and a Vice President of SO; the Secretary and a Vice President of SA; and the Secretary and a Vice President of SOIII. On information and belief, he is a director and employee of SCM.

104.    Picciano, in addition to possessing a fractional interest in SC, is a division president at Resurgent.

105.    Smith, in addition to possessing a fractional interest in SC, holds a senior legal position at Resurgent, and has also presented on compliance topics at meetings of the National Association of Retail Collection Attorneys ("NARCA").

106.    Thurmond, in addition to possessing a fractional interest in SC, is Division President of Resurgent.

107.    Keaton, in addition to possessing a fractional interest in SC, is an Executive Vice President of Resurgent.

108.    Hammond, in addition to possessing a fractional interest in SC, identifies himself as a Director of SFG.

109.    Mazzoli, in addition to possessing a fractional interest in SC, is a director and employee of SCM. He is a Vice President of SO, a Vice President of SA, and a Vice President of SOIII. He has signed legally binding contracts on behalf of SA and SOIII.

110.    On information and belief, Basanik, Wagner, O'Connell, and Grady also hold senior positions within the Sherman Companies' debt-collection enterprise.

111.    Apart from Navarro, Silver, Roderick, Branigan, and Kendall, and the 12 fractional owners of SC, a small number of other individuals hold multiple senior positions in the various entities that form the Sherman Companies' debt-collection enterprise.

112.   Bryan Faliero, who is a director and employee of SCM, is also the president of SFG. Faliero has also been described as the "Director of Acquisitions" for SFG.

113.   Todd Kuhl is a director and/or employee of SCM, as well as a managing director of SFG. He has been a speaker at conferences organized by a national trade association for the debt-buying industry.

114.   Michael Bahner has identified himself both as Managing Counsel for Resurgent and Managing Counsel for SFG.

115.   Laura Schaible has identified herself as a director of SFG, and also signed legally binding documents on behalf of SO. On information and belief, she is a director and employee of SCM.

116.   Sue Shuler, in addition to being a director and an employee of SCM, is the CFO, Treasurer, and a Vice President of SC.

117.   Brett Hildebrand is a Vice President of SC. He has also identified himself as an "authorized representative" of SFG and SA and, on information and belief, is both a director and an employee of SCM.

118.   Tim Grant is CEO of Resurgent. He has also identified himself as a "senior partner" and a "director" of SFG. On information and belief, he is a director and employee of SCM.

119.   The hidden and labyrinthine structure of the Sherman Companies and Street Name Entities is intentional. The main reason the individuals who control

them created this labyrinthine structure is to avoid FDCPA liability, particularly in class actions.

120.    In cases brought under the FDCPA, a successful class may be awarded statutory damages in addition to actual damages.

121.    Under 15 U.S.C. § 1692k(a)(2)(B)(ii), the amount of statutory damages to which a successful class is entitled is limited to "the lesser of $500,000 or 1 per centum of the net worth of the debt collector . . . ."

122.    When the Sherman Companies' single debt-collection enterprise communicates with consumers, it reveals only the name of LVNV and, sometimes, the name of Resurgent. It intentionally conceals the existence of the rest of the Sherman Companies that, among other things, purchased the consumer debts after default; funded those debt purchases; and directed the entire enterprise.

123.    When consumers file FDCPA actions against LVNV, it is the regular practice of LVNV to deny that it is a "debt collector" covered by the FDCPA, and to refuse to produce any discovery that would show that LVNV is part of the Sherman Companies' single debt-collection enterprise.

124.    Moreover, when consumers file FDCPA class actions against LVNV and/or Resurgent, it is the regular practice of LVNV and Resurgent to refuse to produce any discovery into their net worth. When forced to produce net worth discovery, LVNV and Resurgent produce spreadsheets purporting to show that the net worth of each company is substantially lower than $50 million. Copies of these spreadsheets, which were recently unsealed in the case of *Cox v. Sherman Capital*

34

*LLC*, Southern District of Indiana, Case No. 1:12-cv-01654(TWP)(MJD), are attached as **Exhibit Q** (LVNV) and **Exhibit R** (Resurgent).

125.   In the course of net-worth discovery, LVNV and Resurgent intentional conceal the Sherman Companies' vast, single debt-collection enterprise explained in this Complaint.

126.   As late as June 2008, SFG's balance sheet showed total shareholders' equity of over $471 million. Because, in the wake of the 2008 financial crisis, the rate of defaults on consumer credit-card accounts spiked, it is likely that the Sherman Companies' purchase of charged-off receivables – and, correspondingly, the Sherman Companies' collection revenues – have only increased since 2008.

127.   A balance sheet demonstrating that SFG's total shareholders' equity was $471 million in June 2008 is attached as **Exhibit S**. This balance sheet is part of a 10-Q form filed by non-party MGIC Investment Corporation ("MGIC"), and which is publically available on the Security and Exchange Commission's EDGAR database. (No publicly traded corporation has held any ownership interest in SFG since at least 2010.)

128.   For the reasons explained above, LVNV and Resurgent are alter egos of each other; they are also alter egos of SFG, SCM, each of the other Sherman Companies, and of the overarching, single debt-collection enterprise described above.

129.   Based on the facts alleged above – especially the fact that the sole purpose of certain Sherman Companies is to own other Sherman Companies, and

the fact that the approximately 30 directors of SCM exercise complete control over all of the Sherman Companies as if it were a single company through informal discussion and amorphous working groups – plaintiff believes, and therefore alleges, that the operations, interests, assets and liabilities of LVNV and Resurgent have been completely merged into those of SFG, SCM, and the other Sherman Companies, thereby extinguishing the separate personalities of LVNV and Resurgent.

130.    Plaintiff further believes, and therefore alleges, that the interests of LVNV and Resurgent are unified within the same business venture that is owned by SFG, SC, and the Street Name Entities, and that is controlled by SCM, such that the separate personalities of the Street Name Entities and the Sherman Companies – including LVNV and Resurgent – no longer exist, and if the acts of LVNV or Resurgent are treated as those of LVNV or Resurgent alone, an inequitable result will follow.

131.    For the reasons explained above, the Sherman Companies and Street Name Entities, including LVNV and Resurgent, constitute a single economic enterprise whose primary purpose is to collect debts already in default at the time they were obtained.

132.    The single economic enterprise of which LVNV and Resurgent are mere departments has a total net worth that exceeds $50 million.

133.    Because the Sherman Companies and Street Name Entities together constitute a single debt-collection enterprise designed to (a) conceal and/or

36

misrepresent the identity of their members; (b) fail to maintain arm's length relationships with related entities; (c) fail to observe corporate formalities in terms of both behavior and documentation; (d) intermingle assets of parent and subsidiary companies;  (e) manipulate assets and liabilities to concentrate them in certain entities; (f) treat the assets of subsidiary companies as the assets of parent companies; (g) siphon the funds of subsidiary corporations for the purposes of parent corporations; (h) use subsidiary companies as mere facades for parent companies; and (i) leave LVNV and Resurgent significantly undercapitalized, each of the Sherman Companies and Street Name Entities is a debt collector as that term is defined by 15 U.S.C. § 1692a(6).

134.    It follows, and Plaintiff therefore alleges, that LVNV is a debt collector subject to the FDCPA.

## Factual Allegations

135.    On December 31, 2013, EEC sent to Plaintiff a letter, a copy of which is attached as **Exhibit A** ("the Collection Letter").

136.    The Collection Letter purported to be collecting a debt allegedly owed to LVNV ("the subject debt"). The Collection Letter also alleged that the subject debt arose from a consumer credit card issued by non-party Capital One Bank (USA), N.A. ("Capital One").

137.    The subject debt allegedly arose out of a transaction in which money, services or property, which was the subject of the transaction, was primarily for

personal, family and/or household purposes. As such, the subject debt is a "debt" as that term is defined by 15 U.S.C. § 1692a(5).

138.   LVNV purchased the subject debt after it entered default.

139.   The Collection Letter did *not* disclose that LVNV had purchased the subject debt, not from Capital One, but from non-party North Star Capital Acquisitions LLC ("North Star"), *after* the subject debt had been reduced to judgment in the case of *North Star Capital Acquisitions LLC v. Moukengeschaie*, CV-16952-09/QU, New York City Civil Court for the County of Queens.

140.   Upon information and belief, Resurgent arranged to retain EEC to represent LVNV to collect the subject debt.

141.   Neither LVNV nor its predecessor in interest, however, ever took the steps required by New York State Law to take assignment of or enforce the judgment.

142.   Specifically, CPLR 5019(c) requires anyone who takes assignment of a Civil Court judgment to publicly file "a copy of the instrument on which [the assignee's] authority is based, acknowledged in the form required to entitle a deed to be recorded . . . ."

143.   No copy of the instrument on which LVNV's authority is based was ever filed at the New York City Civil Court for the County of Queens, as evidenced by the fact that such copy is completely absent from Clerk's publicly available file on the case. A complete copy of that publicly available file is attached to this Amended Complaint as **Exhibit T**.

38

144.    Further, under the case of *Chase Bank USA v. Cardello*, 27 Misc. 3d

791, 794 (N.Y. Civ. Ct. 2010), in order for an assignment of a judgment to take

effect, the *assignor* must notify the judgment debtor of the assignment.

145.    Here, neither the assignor, North Star, nor the assignee, LVNV

notified Plaintiff of the assignment of the judgment.

146.    Because neither North Star nor LVNV followed CPLR 5019(c) or

*Cardello*, LVNV lacked legal authority either to collect on the subject debt or to use

any of the judicial remedies discussed in the Collection Letter.

147.    CPLR 5019(c) and the *Cardello* rule are not mere technicalities. In

*Cardello*, Judge Straniere explained why these rules are material:

> The recent experience of the Civil Court showing large
> numbers of default judgments being obtained in credit
> card cases against consumers far in excess of the default
> rate in regard to all other litigation, as well as studies
> done by independent consumer rights groups showing
> improper service of process in regard to credit card debt,
> requires that such notice be given to the defendant. The
> situation has been . . . fraught with abuse . . . . Further,
> on a regular basis this court encounters defendants being
> sued on the same debt by more than one creditor alleging
> it is the assignee of the original credit card obligation.
> Often these consumers have already entered into
> stipulations to pay off the outstanding balance due the
> credit card issuer and find themselves filing an order to
> show cause to vacate a default judgment from an
> unknown debt purchaser for the same obligation. Without
> receving such notice of the assignment, a debtor seeking
> to make any application to the court would not have any
> idea as to which alleged creditor is to be served.
>
> . . . It is clear . . . that due process requires that notice of
> the assignment be given to the debtor by the assignor and
> not the assignee. . . .

Allowing the assignee to give notice would enable dishonest debt collectors to search the court records, obtain the names of judgment debtors and send the debtor a letter stating they have purchased the debt . . . and the debtor should make all payments to the third party. Requiring the assignor[] . . . to serve the notice would reduce the incidents of fraud in this regard. The Federal Fair Debt Collection Practices Act lists 16 "false, deceptive or misleading" practices, some of which would not be available by requiring a notice of assignment to be given by the assignor to the debtor. . . . As the [New York State] Court of Appeals stated in *Tri City Roofers v. Northeastern Indus. Park*, . . . "A judgment debtor is not called upon to search the county's records every time he is served with an execution or desires to make a payment on his debt." The failure to establish that notice of the assignment was given to the debtor makes the assignment ineffective.

148.   Here, Plaintiff never knew about the 2009 Civil Court case, and North Star obtained a default judgment – apparently because the process server hired by North Star's attorneys engaged in "sewer service." Moreover, Plaintiff does not recall defaulting on a Capital One credit card.

149.    Thus, Judge Straniere's explanation of why CPLR 5019(c) and *Cardello* are material is especially relevant to Plaintiff's situation.

150.    Upon information and belief, an employee of Resurgent reviewed and approved the Collection Letter before EEC sent it to Plaintiff.

151.    The Collection Letter stated that Plaintiff's "judgment account ha[d] been referred to [EEC's] . . . asset investigation department."

152.    From that statement, in combination with the rest of the letter, the least sophisticated consumer would infer that EEC had an entire department

dedicated to tracking down real estate, cars, sports utility vehicles, trucks, boats, motorcycles, and other personal property.

153.    In fact, EEC has no such department and no such referral was made.

154.    On information and belief, EEC does not regularly identify or seize consumers' personal property. Moreover, EEC had no intention of identifying or seizing Plaintiff's personal property.

155.    Despite the fact that no EEC attorney had reviewed the particular circumstances of Plaintiff's account, the Collection Letter threatened that EEC's "client may consider the availability of additional remedies to recover the balance due."

156.    The Collection Letter falsely stated that it "ha[d] been instructed to find any assets available to help [EEC] . . . collect on the judgment," when in fact EEC had received no such instruction.

157.    The Collection Letter then stated that the non-exempt assets EEC would seek to seize "may include real estate and/or personal property, including cars, sports utility vehicles, trucks boats, and motorcycles, as well as other personal property you may own."

158.    Based on that statement, the least sophisticated consumer would have believed that, under New York State law, real estate, personal property, cars, sports utility vehicles, trucks, boats, motorcycles, and other personal property are non-exempt, when in fact, depending on circumstances, those types of property are quite often exempt from attachment by creditors.

159.    The Collection Letter concluded by warning Plaintiff that "[t]o prevent further collection action and efforts by our office to locate your assets," she was required to call a telephone number.

160.    In fact, EEC had no intention of trying to locate Plaintiff's real estate or personal property.

161.    Plaintiff and the class members have suffered concrete and particularized injuries in fact as a result of being subjected to threats and collection attempts from Defendants, which contained material misrepresentations that Defendants had the right to collect on the alleged debts and that Defendants intended to conduct extensive and invasive asset searches to collect on relatively small judgments.

162.    Upon information and belief, many of the class members have suffered concrete and particularized injuries in fact from having paid funds to Defendants as a result of being subjected to threats and collection attempts from Defendants containing material misrepresentations that they had the right to collect on the alleged debts and that they intended to conduct extensive and invasive asset searches to collect on relatively small judgments.

163.    EEC, on behalf of LVNV and with the approval of Resurgent, and in furtherance of the Sherman Companies' debt-collection enterprise, sent letters substantially similar to the Collection Letter to hundreds, if not thousands, of consumers in New York State.

*Class Action Allegations*

42

164.   Under Federal Rules of Civil Procedure 23, a class action is

appropriate and preferable in this case because:

   a.   Based on the fact that the Collection Letter at the heart of this litigation is a mass mailed form letter, the class is so numerous that joinder of all members is impractical.

   b.   There are questions of law and fact common to the class that predominate over any questions affecting only individual class members. The principal questions presented by this case are (i) whether the letter sent by Defendants (**Exhibit A**) violated various provisions of the FDCPA, including but not limited to 15 U.S.C. § 1692e, § 1692e(3), § 1692e(4), § 1692e(5), § 1692e(10), and § 1692f(6), and (ii) whether Defendants' efforts to collect and enforce judgments it claimed to have purchased without filing a copy of the instruments on which their authority was based and without notice to the consumers violated various provisions of the FDCPA, including but not limited to 15 U.S.C. § 1692e, § 1692e(2), § 1692e(4), § 1692e(5), and § 1692f(6).

   c.   The only individual issues are the identification of the consumers who received the Collection Letter (i.e. the Class members), and the identification of the Class members whose alleged debts were reduced to judgment before LVNV took assignment of the debts (i.e. the Sub-Class members). These issues are matters capable of ministerial determination from Defendants' records.

   d.   Plaintiff's claims are typical of those of the class members, as they are based on the same facts and legal theories.

   e.   Plaintiff will fairly and adequately represent the class members' interests and has retained counsel experienced in bringing class actions and collection abuse claims.

165.   A class action is superior for the fair and efficient adjudication of the

class members' claims as Congress specifically envisioned class actions as a

principal means of enforcing the FDCPA. *See* 15 U.S.C. §1692k.

166.     The members of the class are generally unsophisticated consumers, whose rights will not be vindicated in the absence of a class action.

167.     Prosecution of separate actions by individual members of the class would also create the risk of inconsistent and varying adjudications resulting in the establishment of inconsistent or varying standards for the parties and would not be in the interests of judicial economy.

<u>COUNT I</u>
**Violations of Sections 1692e, e(3), e(4) e(5), e(10), and f(6)
of the Fair Debt Collection Practices Act**

168.     Plaintiff restates, realleges, and incorporates herein by reference all foregoing paragraphs as if set forth fully in this Count.

169.     This Count is brought by Plaintiff, individually and on behalf of a Class consisting of consumers with New York State addresses, as follows:

> All consumers with New York State addresses, who: (a)
> within one year of December 29, 2014; and (b) who
> Defendant EEC claimed owed a debt to Defendant LVNV
> or Defendant Resurgent; (c) were sent a debt collection
> letter by Defendant EEC in a form materially identical or
> substantially similar to the letter attached to Plaintiff's
> Complaint as **<u>Exhibit A</u>** sent to the Plaintiff; or (d) were
> sent a debt collection letter threatening to refer the
> recipient's account to an "asset investigation department;
> or (e) were sent a debt collection letter implying that real
> estate, cars, sports utility vehicles, trucks, boats,
> motorcycles, and other personal property are non-exempt
> assets that are subject to attachment by creditors; and (f)
> the letter was not returned by the postal service as
> undelivered.

170.    Collection letters, such as those sent by Defendants, are to be evaluated by the objective standard of the hypothetical "least sophisticated consumer."

171.    Section 1692e of the FDCPA prohibits a debt collector from using any false, deceptive, or misleading representations in connection with the collection of any debt.

172.    Specifically, FDCPA § 1692e(4) prohibits a collector from "represent[ing] or impl[ying] that nonpayment of any debt will result in . . . the seizure, garnishment, attachment, or sale of any property or wages of any person unless such action is lawful and the debt collector or creditor intends to take such action."

173.    Moreover, FDCPA § 1692e(5) prohibits a collector from threatening "to take any action that cannot legally be taken or that is not intended to be taken."

174.    Furthermore, FDCPA § 1692e(10) prohibits "[t]he use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer."

175.    Finally, Section 1692f(6) of the FDCPA prohibits "[t]aking or threatening to take any nonjudicial action to effect dispossession or disablement of property if (A) there is no present right to possession of the property claimed as collateral through an enforceable security interest; (B) there is no present intention to take possession of the property; or (C) the property is exempt by law from such dispossession or disablement."

176.   By sending the Collection Letter, Defendants violated numerous provisions of the FDCPA, including 15 U.S.C. §§ 1692e, e(4), e(5), e(10), and f(6).

177.   The Collection Letter violates 15 U.S.C. § 1692e, e(4), and e(10) by

- Falsely representing that EEC has an "asset investigation department that identifies and seizes consumers' real estate, cars, sports utility vehicles, trucks, boats, motorcycles, and other personal property.

- Falsely representing that LVNV and/or Resurgent had instructed to locate consumers' real estate, cars, sports utility vehicles, trucks, boats, motorcycles, and other personal property.

- Falsely representing that real estate, cars, sports utility vehicles, trucks, boats, motorcycles, and other property are non-exempt assets that may be seized by creditors, regardless of circumstances.

178.   The letter also violates 15 U.S.C. § 1692e(5) by:

- Threatening to identify and seize consumers' real estate, cars, sports utility vehicles, trucks, boats, motorcycles, and other personal property when it did not intend to identify or seize those assets.

- Threatening to seize assets that were exempt from attachment by creditors under New York State law.

179.   The Collection Letter also violates 15 U.S.C. § 1692f(6), by threatening nonjudicial dispossession of real estate, cars, sports utility vehicles, trucks, boats, motorcycles, and other personal property when there was neither a present right to possession nor a present intention to take possession, and when the property was exempt by law from dispossession.

180.   EEC's violations of 15 U.S.C. §1692, *et seq.*, render it liable to Plaintiff and to members of the Class.

*Meaningful Attorney Involvement (Section 1692e(3))*

181.    FDCPA § 1692e(3) prohibits "[t]he false representation or implication that any individual is an attorney or that any communication is from an attorney."

182.    On information and belief, Defendant EEC attempts to collect upon hundreds if not thousands of judgments each year.

183.    Defendant EEC uses a mechanized computer-driven process to send letters to collect on judgments, and most variable information (such as the name of the creditor, the alleged amount due, and the name of the consumer) is inserted into pre-defined "fields" by a word-processor or other computer-driven document assembly software.

184.    Further, Plaintiff is informed and believes, and on that basis alleges, that Resurgent sends the information to be inserted into these fields to EEC *en masse*, as electronically-stored information, *via* modem or other computer-readable format.

185.    The letters are then created directly from this electronically stored information.

186.    On information and belief, no attorney meaningfully reviews or authorizes any particular individual letter – much less the circumstances of any particular consumer – before it is sent.

187.    Rather, the only attorney involvement is to review the form of letter sent and to define some general parameters as to the intended recipients.

188.   The letters deceptively purport to be "from an attorney" when in fact the letters, which are on EEC attorney-letterhead, are not from an attorney in any meaningful sense.

189.   No attorney reviews the file or determines whether a judgment actually exists before any letter is sent.

190.   No attorney examines the circumstances of any particular consumer before sending a collection letter telling the consumer that his or her car, sport utility vehicle, truck, boat, and other personal property are non-exempt and thus subject to attachment.

191.   Furthermore, no attorney examines the circumstances of any particular before sending a collection letter telling the consumer that his or her wages are subject to garnishment.

192.   In an apparent attempt to avoid liability under FDCPA §1692e(3), the Collection Letter contains the following attempt at a disclaimer: "Currently, no attorney with the firm has personally reviewed the particular circumstances of your account, and this letter should not be taken as a representation of any such review nor as a threat of legal action."

193.   However, above this "disclaimer," in a highlighted box and in all capital letters, the Collection Letter states, "YOUR JUDGMENT ACCOUNT HAS BEEN REFERRED TO OUR ASSET INVESTIGATION DEPARTMENT" – clearly implying that an entire department of asset-hunting lawyers is already looking into the consumer's particular circumstances to determine which items can be taken.

194.   In short, the later threatening language designed to mislead consumers into believing that their cars and other personal property will be confiscated by a sheriff – especially when coupled with the highlighted statement warning that a specialized department is investigating the consumer's assets – overshadows the "disclaimer."

195.   EEC is a collection agency masquerading as a law firm, which uses clerical workers, not attorneys, to collect debts using the power and leverage of a law license.

196.   EEC's violations of 15 U.S.C. §1692e(3) render it liable to Plaintiff and to members of the Class.

### Liability of LVNV and Resurgent

197.   By reviewing and approving the language of the form Collection Letter before it was sent to Plaintiff and to members of the class, Resurgent directly participated in the violations of 15 U.S.C. § 1692, *et seq.*, rendering it liable to Plaintiff and to members of the Class.

198.   Because EEC was acting as the agent of Resurgent when it violated 15 U.S.C. § 1692, *et seq.*, and because EEC was acting under the control of Resurgent when it violated 15 U.S.C. § 1692, *et seq.*, Resurgent is vicariously liable for the acts of EEC and, as such, is liable to Plaintiff and to members of the Class.

199.   Because EEC and Resurgent were acting as the agent of LVNV when they violated 15 U.S.C. § 1692, *et seq.*, and because EEC and Resurgent were acting under the control of LVNV when they violated 15 U.S.C. § 1692, *et seq.*, LVNV is

vicariously liable for the acts of EEC and Resurgent and, as such, is liable to Plaintiff and to members of the Class.

**COUNT II**
**Violations of Sections 1692e, e(2), e(4), e(5), and f(6)**
**of the Fair Debt Collection Practices Act**

200.   Plaintiff restates, realleges, and incorporates herein by reference all foregoing paragraphs as if set forth fully in this Count.

201.   This Count is brought by Plaintiff, individually and on behalf of a Sub-Class consisting of consumers with New York State addresses, as follows:

> All consumers with New York State addresses, who: (a) within one year of December 29, 2014; and (b) who Defendant EEC claimed owed a debt to Defendant LVNV or Defendant Resurgent; (c) were sent a debt collection letter by Defendant EEC in a form materially identical or substantially similar to the letter attached to Plaintiff's Complaint as **Exhibit A** sent to the Plaintiff; or (d) were sent a debt collection letter threatening to refer the recipient's account to an "asset investigation department; or (e) were sent a debt collection letter implying that real estate, cars, sports utility vehicles, trucks, boats, motorcycles, and other personal property are non-exempt assets that are subject to attachment by creditors; (f) the letter was not returned by the postal service as undelivered; and (g) the alleged debts sought to be collected were purchased by LVNV after such debts had already been reduced to judgment.

202.   Section 1692e of the FDCPA prohibits a debt collector from using any false, deceptive, or misleading representations in connection with the collection of any debt.

203.   Specifically, FDCPA § 1692e(2)(A) states that a debt collector cannot make a "false representation of the character, amount, or legal status of any debt."

204.   Moreover, FDCPA § 1692e(4) prohibits a collector from "represent[ing] or impl[ying] that nonpayment of any debt will result in . . . the seizure, garnishment, attachment, or sale of any property or wages of any person unless such action is lawful and the debt collector or creditor intends to take such action."

205.   Furthermore, FDCPA § 1692e(5) prohibits a collector from threatening "to take any action that cannot legally be taken or that is not intended to be taken."

206.   Finally, Section 1692f(6) of the FDCPA prohibits "[t]aking or threatening to take any nonjudicial action to effect dispossession or disablement of property if (A) there is no present right to possession of the property claimed as collateral through an enforceable security interest; (B) there is no present intention to take possession of the property; or (C) the property is exempt by law from such dispossession or disablement."

207.   The Collection Letter claimed that LVNV was entitled to collect upon and enforce Sub-Class members' alleged debts that had already been reduced to judgment when LVNV purchased them.

208.   On information and belief, neither LVNV nor Resurgent ever publicly filed with any court clerk any copies of instruments on which LVNV's authority to enforce those assigned judgments were based.

209.   On information and belief, neither LVNV, Resurgent, nor the assignors of the alleged judgments ever notified the Sub-Class members of the assignments.

210.   LVNV therefore lacked the legal right to collect upon or enforce the judgments allegedly entered against the members of the Sub-Class.

51

211.   By attempting to collect upon and enforce those judgments anyway, Defendants violated numerous provisions of the FDCPA, including 15 U.S.C. §§ 1692e, e(2), e(4) e(5), and f(6).

212.   As to the members of the Sub-Class, the Collection Letter violates 15 U.S.C. § 1692e and e(2)(A) by falsely representing that LVNV had the legal right to collect upon and enforce the assigned judgments – including through wage garnishment and attachment – when in fact it had no such legal right.

213.   As to the members the Sub-Class, the Collection Letter violates 15 U.S.C. § 1692e(4), e(5), and f(6) by falsely representing that LVNV and its agents could legally garnish the wages of Sub-Class members or attach their personal and real property, when in fact LVNV and its agents could not legally take those actions.

214.   The Collection Letter was sent by EEC, whose violations of 15 U.S.C. §1692, *et seq.*, render it liable to Plaintiff and to members of the Sub-Class.

215.   Resurgent retained EEC to collect on the judgments, despite the fact that neither LVNV nor Resurgent (as LVNV's attorney-in-fact) had taken the legal steps necessary to collect on the judgments. Therefore, Resurgent's violations of 15 U.S.C. § 1692, *et seq.*, render it liable to Plaintiff and to members of the Sub-Class.

216.   LVNV hired and instructed Resurgent to collect on the judgments, despite the fact that LVNV had never taken the legal steps necessary to collect on the judgments. Therefore, LVNV's violations of 15 U.S.C. § 1692, *et seq.*, render it liable to Plaintiff and to members of the Sub-Class.

217.    In addition, Resurgent and LVNV are vicariously liable for the violations of their agent EEC, and LVNV is vicariously liable for the violations of its agent Resurgent.

218.    Because without proper notice of assignment of the debts allegedly owed by Plaintiff and the class members, Defendants did not have the right to collect, any sums collected are actual damages, which must be returned.

### *Demand for Jury Trial*

219.    Plaintiff demands a trial by Jury.

*Prayer for Relief*

WHEREFORE, Plaintiff prays that this Court grant the following relief in

her favor, and on behalf of the class, and that judgment be entered against the

Defendants, and each of them, for the following:

    (A)    The maximum amount of statutory damages provided for by § 1692k of the FDCPA;

    (B)    Actual damages;

    (C)    Attorneys' fees, litigation expenses and costs;

    (D)    A declaration that Defendant EEC's form letters, represented by the forms sent to the Plaintiff on or about December 31, 2013 violate the FDCPA;

    (E)    Any other relief that this Court deems appropriate under the circumstances.

Dated: Winston-Salem, N.C.
      October 8, 2017

                      Respectfully submitted,

                      By:   /s/ Jonathan R. Miller
                              Jonathan R. Miller
                              One of Plaintiff's Attorneys

**Attorneys for Plaintiff**
Brian L. Bromberg
Bromberg Law Office, P.C.
26 Broadway, 21st Floor
New York, NY 10004
(212) 248-7906

Jonathan R. Miller
Salem Community Law Office
301 N. Main St., 24th Floor
Winston-Salem, NC 27101
(336) 837-4437

## Certificate of Service

I, Jonathan R. Miller, an attorney, hereby certify that on October 8, 2017, the foregoing document was filed with the Clerk of the Court and served in accordance with the Federal Rules of Civil Procedure, and/or the Eastern District's Local Rules, and/or the Eastern District's Rules on Electronic Service upon the following parties and participants:

Brian Lewis Bromberg        brian@bromberglawoffice.com

Concepcion A. Montoya       cmontoya@hinshawlaw.com

Jonathan M. Robbin          jrobbin@blankrome.com

Matthew B. Corwin           mcorwin@hinshawlaw.com

Matthew E. Lewitz           mlewitz@hinshawlaw.com

Dated:  Winston-Salem, N.C.
        October 8, 2017

/s/ Jonathan R. Miller
Jonathan R. Miller

Jonathan R. Miller
Salem Community Law Office
301 N. Main St., 24th Floor
Winston-Salem, NC 27101